IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

SAMUEL C. JOHNSON 1988 TRUST,
IMOGENE P. JOHNSON,
JOHN HAWKSFORD, KAY HAWKSFORD,
DEAN JOHNSON, and KATHRYN JOHNSON,

                               OPINION AND ORDER

                Plaintiffs,

                               06-cv-348-bbc

        v.

BAYFIELD COUNTY, WISCONSIN,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

From the late 1800s until the late 1970s, railroad tracks ran across land now owned by plaintiffs Samuel C. Johnson 1988 Trust, Imogene Johnson, John and Kay Hawksford and Dean and Kathryn Johnson in the Town of Drummond, Bayfield County, Wisconsin. The tracks are long gone but the title to the railroad's right-of-way remains in dispute.

Plaintiffs Samuel C. Johnson Trust and Imogene Johnson claim title to their lands on the ground that they purchased the right-of-way from the Chicago & North Western Transportation Company in 1980; the remaining plaintiffs say that ownership of the right-of-way over their properties traces back to the first settler, Amos Jefferson, who obtained a

1

certificate of entry in 1882, received a land patent in 1884 and thereafter sold some of his land to the Chicago, St. Paul, Minneapolis & Omaha Railway Company.  For its part, defendant Bayfield County contends that the right-of-way in plaintiffs' properties was granted originally to the railroad upon a condition of reverter to the United States that has never been extinguished, giving defendant the right to establish a public highway on the right-of-way under federal law.

Although defendant Bayfield County's claim to an interest in the right-of-way depends not only on a finding that the railroad is found to have a present interest in the strip of land, but on subsequent extinguishment of that interest, plaintiffs seem satisfied that they have named the proper defendant in the case and the county does not object to the designation.  Jurisdiction is present under 28 U.S.C. § 1331 because the interpretation of federal law is central to the parties' dispute.

Plaintiffs filed this suit to quiet title in June 2006, in an effort to stop the county from converting certain portions of the disputed right-of-way into snowmobile trails.  They sought a declaratory judgment against both the United States and Bayfield County. On November 21, 2006, the United States filed a disclaimer of interest in the property, dkt. #27, and was later dismissed from the case.  On January 1, 2007, Judge Shabaz granted plaintiffs' motion for summary judgment after finding that the disclaimer of interest extinguished defendant Bayfield County's right to the property.

2

The Court of Appeals for the Seventh Circuit vacated the district court judgment, holding that "the United States's Disclaimer did not serve to extinguish any interest the County holds in the railway line," and was therefore not dispositive of the case. Samuel C. Johnson 1988 Trust v. Bayfield County, 520 F.3d 822, 833 (7th Cir. 2008). The court remanded the case with instructions to this court to determine "whether the United States did in fact retain a reversionary interest in the land at issue and, if so, whether the railroad's right-of-way has been abandoned according to the terms of [43 U.S.C.] § 912 and [16 U.S.C.]§ 1248(c)." Id.

Upon remand, plaintiffs renewed their motion for summary judgment. Although defendant has not filed its own separate motion for summary judgment, it argues that the undisputed facts show it is entitled to judgment as a matter of law. In an interesting turn-around, the United States has filed a statement of interest under 28 U.S.C. § 517. Dkt. #80. Although it disclaimed any interest in the property when the case was first before the court, it contends now that it retains a right of reverter in the disputed real property because the property is a federally granted right-of-way that has not been "abandoned" under § 912. Plaintiffs cry foul; they want the United States judicially estopped from asserting a position contrary to the one it took when this case was first before this court. I agree with plaintiffs that the United States' change of positions is odd, but disagree that the change warrants estoppel. "The doctrine of judicial estoppel provides that 'when a party prevails on one legal

3

or factual ground in a lawsuit, that party cannot later repudiate that ground in subsequent litigation based on the underlying facts.'" <u>Pakovich v. Broadspire Services, Inc.</u> 535 F.3d 601, 606 (7th Cir. 2008) (quoting <u>Urbania v. Central States, Southeast & Southwest Areas Pension Fund</u>, 421 F.3d 580, 589 (7th Cir. 2005). The critical word is "prevail." If the party to be estopped did not prevail upon its original position, the doctrine does not apply and it may take a different tack in renewed proceedings. <u>Id.</u>

Although the United States has not moved to intervene on remand, its stake in the outcome of this case is significant, affecting the government's interests in rights-of-way throughout the country. Accordingly, I will treat its arguments as those of an amici curiae.

I conclude that the United States retains a reversionary interest in the right-of-way over plaintiffs' properties. Acting through the State of Wisconsin, the federal government conveyed the right-of-way to a railroad either explicitly under the Right of Way Act of 1852 or implicitly under the Land Grant Acts of 1856 and 1864. The interest conveyed was for the purpose of constructing a rail line and for none other, making the interest conveyed subject to a right of reverter to the United States. The state conveyed the land to the railroad; the right-of-way has never been formally declared or decreed abandoned in conformance with federal law. The Chicago & North Western Transportation Company retains its interest in the right-of-way as successor to the railroads that built the line. This does not mean, however, that it was free to convey any portion of the right-of-way in section

4

21 to the Samuel Johnson plaintiffs.  Its interest was always subject to the United States'

right of reverter.  (As will become apparent, the section numbers are important.  When the

Middle West was surveyed, each state was laid out in townships and sections.   The

townships were six miles square and made up of 36 numbered sections, each one mile square.

Land grants to the railroad companies in aid of construction gave the railroads a certain

number of odd-numbered sections of public lands adjacent to the rail lines, while reserving

even-numbered sections for sale to prospective settlers.)

The railroad acquired its interest in the right-of-way in section 32 before homesteader

Amos Jefferson entered onto the land.  Whatever land Jefferson acquired by entry certificate

and later patent did not include the right-of-way.

Finally, I conclude that neither the United States nor Bayfield County is equitably

estopped from asserting any reversionary rights in the right-of-way by any actions it has

taken with respect to the line or to plaintiffs.

From the findings of fact properly proposed by the parties and from the record, I find

the following facts to be both material and undisputed.

## UNDISPUTED FACTS

### A.  Parties

Plaintiffs Samuel C. Johnson Trust 1988 and Imogene Johnson (whom I will refer to

5

as plaintiff Trust for convenience) own land in Bayfield County, Wisconsin in Township 44 North, Range 7 West, in Section 21.  Samuel and Imogene Johnson purchased title to this property from the Chicago and North Western Transportation Company, which was the last railroad company to use and own the railroad tracks on the disputed property.  The company quit claimed all of its interest in Township 44 North to the Johnsons on March 14, 1980.

Plaintiffs John and Kay Hawksford and Dean and Kathryn Johnson own land in an even-numbered section, 32, in Township 44 North, Range 7 West in Bayfield County.  Plaintiff John Hawksford and his previous wife purchased their property in 1986; plaintiffs Dean and Kathryn Johnson purchased theirs in 1992.  The former right-of-way runs through the middle of the Hawksford property and bisects the property owned by Dean and Kathryn Johnson.

B. <u>Congress's Grant of Rights of Ways and Land Grants</u>

1. <u>Legislative programs to promote railroad construction</u>

In the mid and late 1800s, the United States Congress engaged in two separate programs to spur the laying of tracks across the country:  granting railroad companies rights-of-way across public lands and making grants of land to the companies.  In some instances, these grants were made directly to a particular company; in others, the grants were to the

states to be used for the construction of railroad lines.

2. <u>The Right of Way Act of 1852</u>

The Right of Way Act of 1852 gave to any railroad companies or builders of plank roads and Macadamized turnpikes chartered by the state within ten years, a right-of-way 100 feet in width over and through any public lands of the United States, "over which any rail or plank road or Macadamized turnpikes are or may be authorized by an act of the legislature of the respective States in which public lands may be situated."  Ch. 80, 10 Stat. 28 (Aug. 4, 1852).  The grants were conditioned on the companies' transmitting a correct plat of the survey of the road to the Commissioner of the General Land-Office and beginning construction within ten years.  The Act provided that "if any road, at any time after its completion, be discontinued or abandoned by said company or companies, the grants hereby made shall cease and determine, and said lands hereby, granted, revert back to the general government."  Id.  In 1855, Congress extended the provisions of the Act to "all of the public lands of the United States, in the Territories of the United States."  Ch. 200, 10 Stat. 686 (Mar. 3, 1855) and in 1862, it amended the original Right of Way Act to extend its provisions for an additional five years.  Ch. 179, 12 Stat. 577 (July 15, 1862).  Under the amendment, a chartered railroad company had until 1867 to begin construction of a line and fifteen years thereafter to complete construction, or until 1882.

7

3. Congressional land grants to states in aid of railroad construction

To promote construction, the United States government "embarked on a policy of subsidizing railroad construction by lavish grants from the public domain." Great Northern Railway Co. v. United States, 315 U.S. 262, 273 (1942). Congress dispensed the grants in a checkerboard fashion, with alternating public and private sections. Leo Sheep Co. v. United States, 440 U.S. 668, 672 (1979). Congress granted odd-numbered sections to the railroad companies and reserved even-numbered sections for sale to private landowners. Leo Sheep, 440 U.S. at 672.

In 1856, Congress made a grant of public land to the state of Wisconsin. The Act provided that

> there be, and is hereby, granted to the State of Wisconsin for the purpose of aiding in the construction of a railroad from Madison, or Columbus, by the way of Portage City to the St. Croix River or Lake between townships twenty-five and thirty-one, and from thence to the west end of Lake Superior; and to Bayfield; and also from Fond du Lac on Lake Winnebago, northerly to the state line, every alternate section of land designated by odd number for six sections in width on each side of said roads respectively . . . *Provided further*, That the lands hereby granted shall be exclusively applied in the construction of that road for which it was granted and selected, and shall be disposed of only as the work progresses, and the same shall be applied to no other purpose whatsoever:
>
>                           \*\*\*
>
>     Sec. 2. *And be it further enacted*, That the sections and parts of sections of land which, by such grant, shall remain to the United States, within six miles on each side of said roads, shall not be sold for less than double the

8

> minimum price of the public lands when sold; nor shall any of said lands become subject to private entry until the same have been first offered at public sale at the increased price.
>
> Sec. 3. *And be it further enacted*, That the said lands hereby granted to said State shall be subject to the disposal of the legislature thereof, for the purposes aforesaid, and not other; and the said railroads shall be and remain public highways for the use of the government of the United States free from toll or other charge upon the transportation of property or troops of the United States.

Ch. 43, 11 Stat. 20 (June 3, 1856). In November 1856, the Wisconsin legislature accepted the grant of lands. A later land grant act in 1864 increased the amount of land granted in aid of construction from six alternate odd-numbered sections on each side of "said roads" to ten such sections. Ch. 80, 13 Stat. 66 (May 5, 1864). Section 21 was among the lands transferred by the United States to the State of Wisconsin on July 5, 1863, under the 1856 Act. The state transferred the section and other lands to the railroad on July 9,1883.

The lavish land grants did not last long: scandal and public disfavor led to their demise. Leo Sheep Co., 440 U.S. at 677, n.13 (discussing Crédit Mobilier scandal in which allegations of improper use funds and bribery of members of Congress resulted in resolution condemning grants); see also Great Northern Railway Co., 315 U.S. at 273. This did not deter Congress from continuing to encourage the expansion of the railroads through right-of-way acts such as the General Railroad Right of Way Act of 1875. 43 U.S.C. § 934 ("The right of way through the public lands of the United States is granted to any railroad

company duly organized under the laws of any State . . . , or by the Congress of the United States, . . . to the extent of one hundred feet on each side of the central line of said road"). Unlike the previous land grants, however, these acts did not grant title to large swaths of land but provided mere easements to railroads across public lands.  United States v. Union Pacific Railroad, 353 U.S. 112, 119 (1957) ("railroads received all surface rights to the right-of-way and all rights incident to a use for railroad purposes"); Great Northern Railway Co., 315 U.S. at 273-74.

C. The Railroad Corridor

The railroad corridor at issue is part of a branch of a railroad line constructed from Trego, Wisconsin to Bayfield, Wisconsin, between approximately 1874 and 1884.  It was known as the Bayfield Branch of the line that ran between Columbus, Wisconsin and the west end of Lake Superior and from there to Bayfield.

In 1852, the Wisconsin legislature took action to incorporate the La Crosse and Milwaukee Railway Company, with the power to "locate and construct a railroad with one or more railways or tracks from such points in the village of La Crosse . . . to such point in the city of Milwaukee as shall be determined by the directors."  Wis. Stat. ch. 198, Apr. 14, 1852.  On February 24, 1854, the legislature authorized the incorporation of the St. Croix and Lake Superior Railroad Company.  In 1856, it authorized the La Crosse and Milwaukee

10

to build and operate railroads between Madison and Superior and to Bayfield, specifying

that the railroad was to have the same rights, privileges, etc. with reference

> to the said routes, or any railroad to be built thereon, *as it now possesses, or enjoys, with*
> *reference to any route it is now authorized to occupy,* or any railroad built or to be built
> thereon; and there is hereby conferred upon the La Crosse and Milwaukee railroad
> company, all the power and authority contained in the charter of said company, and
> in the acts amendatory thereof, for the purpose of carrying out the object of this act
> and of appropriating and applying lands hereinafter, in this act granted, or their
> proceeds, to aid in the construction of railroads by this act authorized to be built.

Wis. Ch. 122 (published Nov. 4, 1856).  (Emphasis added.)

In 1857, the legislature amended the 1854 Act incorporating the St. Croix and Lake

Superior to authorize the railroad to survey and locate a railroad from any point on the St.

Croix lake or river to the west end of Lake Superior and to Bayfield "and for such purpose

[to] possess all the rights, powers and privileges conferred by its charter in relation to the

road therein authorized to be constructed."  Wis. Ch. 230 (published Mar. 5, 1857).  The

legislation included a provision authorizing the La Crosse and Milwaukee Railroad to convey

to the St. Croix and Lake Superior railroad all right, title and interest in the lands previously

granted to it that lay north of the point where the La Crosse and Milwaukee railroad would

intersect the St. Croix lake or river.  The St. Croix railroad filed a map of definite location

with the General Land Office of the Department of the Interior in July 1858.  The lands

necessary for the right-of-way were withdrawn from further sale or entry at that time.  As

11

filed, the map did not include the lands now owned by plaintiffs; the actual route departed from the 1858 map and included the lands at issue.  In a decision issued in 1887, the Department of the Interior held that the map as filed encompassed the line as actually built. Chicago, St. Paul, Minneapolis Omaha Ry. Co. (Bayfield Branch), 6 Pub. Lands Dec. 209, 1887 WL 561 (D.O.I.)

On March 20, 1865, the state conferred upon the St. Croix and Lake Superior railroad the benefit of the land grants made to the state by Act of Congress dated May 5, 1864.  and confirmed the rights conferred by Act of Congress dated June 3, 1856.  Wis. Ch. 175 (published May 2, 1865).  In 1874, the legislature transferred the grants to the North Wisconsin Railway Company, which later merged into the Chicago, St. Paul, Minneapolis & Omaha Railroad Company, owner and operator of the Bayfield Branch.  Wis. Ch. 126, published Mar. 11, 1874).  The first 20-mile strip of railroad between St. Croix and Bayfield was completed by 1874.  In the same year, the Wisconsin legislature approved a resolution to Congress, seeking the grant of a reasonable time to allow the state to complete the partially constructed road from Lake St. Croix to Lake Superior, noting that "the war, with its accompanying evils, delayed the construction" of the railroad.  Wis. Feb. 21, 1874 Resolution.  In 1877 and again in 1878, the legislature voted to waive the forfeiture for the railroad's failure to construct twenty miles of its road during the preceding year and to extend the time for construction for another year.  Wis. Ch. 218 (published Mar. 15, 1877);

Wis. Ch. 213 (published Mar. 25, 1878.)  The Bayfield Branch was certified as complete no later than June 19, 1882.  The United States did not rescind or revoke the right-of-way grant made by the Act of 1852 or the grants made in the Acts of 1856 and 1864.

### D. Disposition of the United States' Reversionary Interests

Congress first addressed the disposal of the United States' reversionary interests in railroad right-of-ways in 1922.  The Abandoned Railroad Right of Way Act, 43 U.S.C. § 912, gave adjacent landowners the ability to acquire title to a railroad right-of-way if the right-of-way was declared or decreed abandoned or forfeited "by a court of competent jurisdiction or by Act of Congress" and if the land has not been "embraced in a public highway legally established within one year of the declaration or decree."   Congress passed a companion act, 43 U.S.C. § 913, allowing railroad companies to sell their interests in the railroad rights-of-way to state and local governments for public highways or streets.  Sixty years later, in 1982, Congress enacted 16 U.S.C. § 1248 to preserve the United States' interest in the rights-of-ways for use as recreational trails.  Subchapter (c) of the new statute provided that

> Commencing upon October 4, 1988, any and all right, title, interest, and estate of the United States in all rights-of-way of the type described in section 912 of Title 43, shall remain in the United States upon the abandonment or forfeiture of such rights-of-way, or portions thereof, except to the extent that any such right-of-way, or portion thereof, is embraced within a public highway

13

no later than one year after a determination of abandonment or forfeiture, as
provided under such section.

The court of appeals has treated § 1248(c) as an amendment of § 912.  Samuel C. Johnson

1988 Trust, 520 F.3d at 826 ("Under this amendment, abandoned railway lines would no

longer pass to the adjacent landowner, but instead the United States would retain title to the

property, provided again that the line was not converted to a public highway within one year

of a determination of abandonment."); see also Mauler v. Bayfield County, 309 F.3d 997,

999 (7th Cir. 2002) ("16 U.S.C. § 1248(c) modifies § 912").


E.  The Odd-Numbered Sections of Land along the Bayfield Branch of the Railroad

        In accordance with the Land Grant Acts of 1856 and 1864, the State of Wisconsin

transferred to railroad companies that completed the laying of 20-mile segments of tracks

"all the right, title and interest" to the land that it had received from the federal government,

which consisted of "every alternative section of land designated by odd numbers for six

sections of width  on each side of said roads respectively."  Ch. 43, 11 Stat. 20; Ch. 80, 33

Stat. 66.  In 1874, the Wisconsin Legislature granted the North Wisconsin Railway

Company (the successor-in-interest to the La Crosse and Milwaukee Railway Company) title

to Section 21.  A series of railroad companies used the rail line for nearly a century.

        In 1974, the Chicago and North Western Transportation Company, the successor-in-

14

interest to the Chicago, St. Paul Minneapolis & Omaha Railroad, filed a "Notice of Abandonment" of the right-of-way.  In 1978, the Interstate Commerce Commission issued an order permitting the company to abandon the corridor.  In 1980, the railroad pulled up the tracks.

On May 18, 1979, Wisconsin issued a "Statement of Release of Interest" regarding the disputed right-of-way.  Defendant Bayfield County declined to acquire the right-of-way. Neither the state nor defendant has used the disputed property for public purposes since 1978.

In 1980, the Chicago & North Western sold its interest in the "abandoned" right-of-way to Samuel C. and Imogene P. Johnson. The conveyance consisted of all of the company's interest in Township 44 North and 45 North, Range 7 West.    At the request of the United States Forest Service, the Johnsons donated a substantial portion of the right-of-way to the Forest Service, while maintaining a small portion of that right-of-way for themselves and their neighbors.  The Forest Service erected barriers at the northern and southern points of the disputed right-of-way, separating Forest Service land from the lands at issue.

F.  The Even-Numbered Sections of Land along the Bayfield Branch

On December 1, 1882, acting under state law, the Chicago, St. Paul, Minneapolis & Omaha Railroad condemned a right-of-way 100 feet wide through numerous properties in

15

Bayfield County and surrounding areas, including property that Amos Jefferson had purchased in Government Lot 2 of section 32 on May 8, 1882.  On August 9, 1884, Jefferson received a patent for this land.

The railroad acquired 1,700 parcels in the even-numbered sections by deed and through additional condemnation proceedings, each of which it recorded in the appropriate county circuit court and recorder's office.

In 1986, plaintiff John Hawksford and his previous wife purchased property that had been owned at one time by Amos Jefferson.  Four years later, he and his present wife built a residence and tractor garage and installed a driveway on their property.  The home was located 100 feet from the former right-of-way; the tractor garage and driveway are located on the footprint of the former right-of-way.  In 1992, Dean and Kathryn Johnson purchased their property.

OPINION

A. Tracing Title to the Disputed Right-of Way

In following the title to the disputed right-of-way, three pieces of legislation provide a roadmap.  The first is the Right of Way Act of 1852; the second and third are the Land Grant Acts of 1856 and 1864.  The first act gave a right-of-way through the public lands owned by the United States in Wisconsin and other states to companies chartered by the

16

state to build railroads or other kinds of roads.  The second two gave Wisconsin the right to allocate odd-numbered sections of public lands adjacent to the railroad lines to the railroad companies to provide capital for the costs of construction.  The Right of Way Act includes an explicit right of reverter ("if any road, at any time after its completion, be discontinued or abandoned . . . the grants hereby made shall cease and determine, and said lands hereby granted, revert back to the general government").  Ch. 80, 10 Stat. 28.  Plaintiffs attack its legitimacy, arguing that it was an obscure piece of legislation, never mentioned in the subsequently enacted Land Grant Acts of 1856 and 1864 or in any historical documents, never implemented by the State of Wisconsin and never complied with by any railroad.

This seems an odd position to take.  Obscure or not, the Act was passed by Congress and therefore, comes with the presumption that it was valid, enforceable and complied with. It is true that the Land Grant Acts of 1856 and 1864 make no explicit reference to the Right of Way Act of 1852, but a fair reading of them supports the view that the Acts were intended to build on the earlier legislation.  The Acts make repeated references to the "road": "every alternate section of land designated by odd numbers for six sections in width of each side of said *roads* respectively"; "That the lands to be so located shall in no case be further than fifteen miles from the line of the *roads* in each case, and selected for and on account of said *roads*"; "That the sections and parts of sections of land which, by such grant, shall remain to the United States, within six miles on each side of said *roads*."  (Emphasis added.)

17

The lack of explicit reference to the 1852 Act may be attributed to simple oversight in the maelstrom of land grants enacted in the 1850s and 60s.  Paul W. Gates, History of Public Land Law Development 361 (Public Land Law Review Commission 1968) (during administration of Franklin Pierce (1853-57), members of Congress were pushing their favorite measures for Western growth and economic development, "with little regard for economic feasibility or whether their grants would overlap others that had been given in early measures").

As to whether the railroads complied with the provisions in the Right of Way Act, the evidence is that they did.  The Act required (1) a company chartered within ten years of passage of the Act; (2) the state's authorization of a railroad over public lands of the United States within the state; (3) construction beginning within ten years and completed within 15 (later extended another 15 years); and (4) transmission to the Commissioner of the General Land-Office of a correct plat of the survey of the road.  Ch. 80, 10 Stat. 28 (Aug. 4, 1952).  The St. Croix and Lake Superior railroad and its successor met these requirements.  The St. Croix was chartered within ten years of the Act's passage; the state authorized it to build a railroad within Wisconsin; and the Department of the Interior determined that the railroad had filed a map of definite location in 1858.  The railroad met the condition of beginning construction before August 4, 1867 and it completed construction of the Bayfield Branch within 15 years thereafter, despite the intervening Panic

18

of 1857 and the Civil War.

Plaintiffs cite certain historical records as supporting their view that the Right of Way Act is of no significance.  The documents shed little light on the validity of plaintiffs' position on the Right of Way Act.  For example, the Secretary of the Interior's Statement of Land Grants made by Congress identifies portions of plaintiffs' property in section 21 granted by the Acts of 1856 and 1864, but does not purport to distinguish between a grant of land and the grant of a right-of-way in the same property.   Similarly, the letter from the Commission of the General Land Office of the Department of the Interior states only the unexceptional proposition that the *land grants* for the Bayfield Branch were made pursuant to the Acts of 1856 and 1864.

The actions of the railroad may be the best evidence that it had acquired a right-of-way under the Right of Way Act of 1852.  Certainly, the La Crosse and Milwaukee's successors, the St. Croix and Lake Superior Railroad and the North Wisconsin Railroad, proceeded as if they had a right-of-way for the Bayfield Branch.  The St. Croix filed a map of definite location in July 1858.  Although the filed map varied from the actual route constructed later, the Department of the Interior found that, under the circumstances, the map was sufficient to encompass the route as it was constructed.  <u>Chicago, St. Paul, Minneapolis Omaha Ry. Co. (Bayfield Branch)</u>, 6 Pub. Land Dec. 209 (1887) 1887 WL 561 (D.O.I.).  The St. Croix railroad's successor, the Chicago, St. Paul, Minneapolis and Omaha

19

Railway, completed the construction of the Bayfield Branch in 1882.

If, as plaintiffs contend, the Right of Way Act played no role in the development of the railroads, then the Land Grant Acts must be read as conveying an implicit grant of whatever right-of-way the railroad companies would need to construct the rail lines, leaving it up to the State of Wisconsin to determine the grantees. No other conclusion could follow from the language in the Acts anticipating a future determination of "the line or route of said road" from the St. Croix river or lake to the west end of Lake Superior and "from some point on the line of said railroad, to be selected by said state, to Bayfield." Ch. 80, § 1. To read the Land Grant Acts in this way is the only reasonable way of explaining the Acts' specific and repeated references to the grant of sections of land on each side of the "road." Otherwise, it would be necessary to believe that Congress would grant thousands of acres of public land to the state of Wisconsin as stimulus for the construction of railroads without including grants of continuous rights-of-way through public lands. The unlikelihood of this having happened is illustrated by plaintiffs' diagram of a township shown below.

20



**Section Numbering**

Fex Decl., dkt. #20, exh. 7.  As the diagram shows, unless one draws a straight diagonal, any

line drawn through a township will traverse both even and odd-numbered sections.  Chaotic

as the period of the railroad land grants may have been, Congress can be credited with

knowing that railroad lines cannot proceed across a state in a perfect diagonal and that they

21

cannot traverse a township without passing through both odd and even-numbered sections. It would be perverse to think that in the middle of an unprecedented effort to develop railroad lines, Congress would have given the railroads title to only those bits and pieces of a right-of-way that fell within the odd-numbered sections, expecting the railroads to fill in the gaps with strips of land they obtained in other ways in the even-numbered sections.  No railroad could have succeeded in constructing a line under those circumstances.  St. Joseph & Denver City Railroad Co. v. Baldwin, 103 U.S. 426, 450 (1880) (holding that it would present "very serious obstacles" to construction of railroad to force company to purchase interests in right-of-way over occupied sections).

Perverse as such a reading might be, plaintiffs endorse it.  They rest their case on the ownership of the right-of-way in the even-numbered sections on the evidence of the railroad's acquisition of property by deed and condemnation, citing the Interstate Commerce Commission Division of Valuation Land Schedule, Fex Decl., dkt. #20, exh. 16.  This schedule lists the properties acquired by the Chicago, St. Paul, Minneapolis & Omaha Railroad by condemnation.  The import of this document is slight because defendant does not dispute that the railroad acquired right-of-way interests by condemnation in section 32 and other even-numbered sections.  It is, however, very much disputed whether those proceedings were the source of the railroad's interest in its right-of-way in the even-numbered sections.  Nothing in the exhibit suggests that the ICC had any reason to consider

22

that particular question.

Pointing out that the railroad bought title from Amos Jefferson to the disputed right-of-way in section 32 in a condemnation proceeding in a Wisconsin state court, plaintiffs assert that the railroad would never have expended the effort to acquire title to Jefferson's parcel and approximately other 1,700 parcels of land in Bayfield County and elsewhere by a series of similar state court condemnation proceedings had it thought it had title to the right-of-way by virtue of the 1852 Act or under the Land Grant Acts.

Although there is some surface appeal to plaintiffs' argument, the condemnation proceedings are not enough by themselves to establish conclusively that the railroad had not acquired title to the right-of-way in the even-numbered sections before it sought to quiet title by purchase and condemnation.  The railroad may have chosen to condemn the property to simplify any competing claims to title rather than engage in lengthy court proceedings.  The opportunity for confusion over land ownership was rampant:  overlapping land grants from the federal government, the varying routes of the right-of-way and the lack of any grants of patents to a railroad for its right-of-way.  United States v. Union Pacific Railroad, 353 U.S. 112, 116-17 (1957) (noting that land needed for right of way was not acquired through issuance of patent but by filing of map of definite location followed by its actual construction) (citing Northern Pacific R. Co., 190 U.S. 270)).

Acquiring the right-of-way by purchase or condemnation clarified the railroad's title

23

to the strip of land that made up the right-of-way in the public lands, but it was not the source of the title.  That right was explicit in the Right of Way Act or implicit in the Land Grant Acts.  More than the existence of a deed is necessary to show that Jefferson had fee simple title in the right-of-way.  <u>Bybee v. Oregon & California Ry. Co.</u>, 139 U.S. 663, 679-80 (1891) (holding that railroad not estopped from asserting title through congressional grant of right-of-way by obtaining deed from plaintiff for right-of-way through plaintiff's property to install railroad line).

It is undisputed that Jefferson filed a cash entry certificate for land including the properties now owned by the Hawksford-Johnson plaintiffs on May 8, 1882 and received a patent from the United States on August 8, 1884.  Plaintiffs contend that this patent confirms that Jefferson acquired title to the property on May 8, 1882.  Defendant disputes this contention, but it is not necessary to resolve the dispute.  It is irrelevant whether Jefferson acquired "title" to any land in section 32 by certificate of entry or by patent because  he could not have acquired title to the right-of-way at issue. The railroad filed its map of definite location in 1858, years before Jefferson entered section 32.

Plaintiffs argue that because the railroad did not follow the map but took a different route once it saw the terrain, its map of definite location did not give notice to settlers such as Jefferson, who were trying to buy land.  The 1887 Public Lands decision of the

Department of the Interior, <u>Chicago, St. Paul, Minneapolis Omaha Ry. Co. (Bayfield Branch)</u>, 6 Pub. Lands Dec. 209, 1887 WL 561 (D.O.I.), refutes this argument, but it fails for a practical reason as well.  It is undisputed that the railroad completed construction of the Bayfield Branch on June 18, 1882, within weeks after Jefferson's arrival.  Plaintiffs cannot argue that any discrepancy between the line shown in the map of definite location and the actual line would have misled Jefferson into thinking he was buying land free of the railroad's right-of-way.  The physical evidence of the right-of-way would have been obvious. I conclude, therefore, that the railroad established title before Jefferson acquired any title. <u>Leo Sheep</u>, 440 U.S. at 679 (to be valid against railroad, private claims had to be established before railroad's claim vested).


### B. <u>The Nature of the Interest Acquired by the Railroad</u>

1. <u>Odd-numbered sections</u>

Plaintiffs maintain that the railroad's interest in the right-of-way in the odd-numbered section traversing plaintiff Trust's property was a fee simple interest unlimited by any right of reversion to the United States.  Therefore, they say, it was one that the railroad could pass to plaintiff Trust by deed.

Defendant sees no reason for the court to address this issue because the court decided

it in defendant's favor in <u>Mauler v. Bayfield County</u>, 204 F. Supp. 2d 1168 (W.D. Wis. 2001), which was affirmed by the Court of Appeals for the Seventh Circuit.   <u>Mauler v. Bayfield County</u>, 309 F.3d 997 (2002).   Plaintiffs contend that <u>Mauler</u> was decided incorrectly, with a disregard for controlling Supreme Court precedent, and should be reconsidered.   Of course, plaintiffs understand that a district court cannot reconsider a decision of a higher court in the judicial hierarchy, even if the decision affirmed the district court's.   I could simply ignore plaintiffs' argument, but it may be helpful to explain why I believe it is wrong.

In <u>Mauler</u>, the parties assumed that the contested right-of-way derived from the same Land Grant Acts of June 3, 1856 and May 5, 1864 at issue in this case.   (The Maulers' claim involved a right-of-way in an odd-number section so it was unnecessary to consider the source of the right-of-way in an even-numbered section.)   In both grants, Congress conditioned the railroads' receipt of title on the companies' use of the land exclusively for the construction of the railroad "for which it was granted and selected" and applying it "to no other purpose whatsoever."   Ch. 43, 11 Stat. 28 (June 3, 1856).   The same terms were adopted by reference in the 1864 Act.   Neither Act made any explicit reference to retention by the United States of a reversionary interest in the railroad right-of-way.

The Maulers argued that the United States intended to retain reversionary rights in

26

rights-of-way only when it made the rights-of way the subject of an explicit grant, not when the right-of-way was merely implied in a grant of lands in aid of construction.  I found this an unpersuasive argument, noting that in <u>Townsend</u>, 190 U.S. 267, the Supreme Court had characterized the grants of the rights-of-way to the railroads before 1871 as being in the nature of "a limited fee, made on an implied condition of reverter in the event that the company ceases to use or retain the land for the purpose for which it was granted."  <u>Id.</u> at 271; <u>see also</u> <u>Great Northern Railway Co. v. United States</u>, 315 U.S. 262, 275 (1942) (explaining "sharp change in Congressional policy after 1871"; in acts passed before that year, Congress granted railroads limited fee interests in rights-of-way, but after 1871, it conveyed only easements over public lands).

Congress did not include in the 1856 and 1864 Land Grant Acts specific language indicating that the right-of-way would revert to the United States.  Nevertheless, as I concluded in <u>Mauler</u>, it was Congress's intent to retain a reversionary interest in the strips of land constituting the right-of-way that was included in the 1856 grant of lands, despite the Act's omission of explicit language to that effect.  <u>See also</u> <u>Mauler</u>, 309 F.3d at 1001 ("Nothing in the <u>[Northern Pacific Ry. v.]</u> <u>Townsend</u> opinion suggests that the Court intended to distinguish between a land grant for a 'right of way . . . for the construction of a railroad' (the <u>Townsend</u> grant) and a land grant 'for the purpose of aiding the construction of a railroad' (the grant in this case.")).  By conditioning the land grant on the use of the

27

lands for the purpose of constructing and operating a railroad, Congress made it clear that the fee interest in the rights-of-way conveyed to the railroad companies was a limited one. It was not one they were free to alienate in their discretion. Grand Trunk Railroad v. Richardson, 91 U.S. 454, 468 (1875) ("a railroad company is not at liberty to alienate any part of its roadway so as to interfere with the full exercise of the franchises granted"). This conclusion is consistent with the holding in Townsend, 190 U.S. at 272, that reverter to the United States is implicit when the government conveys interests in land to a railroad for the limited purpose of building a railroad.

Plaintiffs contend that this conclusion was wrong under both the Land Grant Acts and case law. They argue that under the Acts at issue in both Mauler and in this case, Congress vested title to the land in fee simple absolute to the state of Wisconsin. This is true with respect to the grants of land, but not with respect to the right-of-way. Townsend makes it clear that the title to the right-of-way was not fee simple absolute; rather, it was a limited fee interest, subject to reversion if the right-of-way was not used for the purpose for which it was granted. Townsend, 190 U.S. at 271 ("Manifestly, the land forming the right of way was not granted with the intent that it might be absolutely disposed of at the volition of the company. On the contrary, the grant was explicitly stated to be for a designated purpose, one which negated the existence of the power to voluntarily alienate the right-of-way or any portion thereof.").

28

Plaintiffs cite Schulenberg v. Harriman, 88 U.S. 44 (1874), and Wisconsin Central Railroad. Co. v. Price County, 133 U.S. 496, 502 (1890), in support of their contention that the railroad received a fee simple interest in the right-of-way.  The cases do not support their argument.  Both cases concerned lands in aid of construction, rather than rights-of-way.  In Wisconsin Central, the Court held that the railroad was not liable for state taxes imposed on land that had been granted to the railroad in aid of construction but as to which it had never received a patent because of a dispute with the federal government.  In Schulenberg, the Court held that the state of Wisconsin could claim damages for logs harvested from land granted to the state to be applied to the construction of a railroad, even though the railroad had not completed construction of the line.

Plaintiffs try another tack, arguing that Townsend's "implied right-of-way" is no longer good law in light of the Supreme Court's decision in Leo Sheep v. United States, 440 U.S. 668 (1979).  They rely on the Court's statement that it was "unwilling to imply rights-of-way, with the substantial impact that such implication would have on property rights granted over 100 years ago, in the absence of a stronger case for their implication than the Government makes here." Id. at 681-82.  Leo Sheep involved property rights under the Union Pacific Act of 1862, 12 Stat. 489 ( July 1, 1862), which was a railroad land grant act similar to those at issue in this case, but the case had nothing to do with a railroad right-of-way.  It was brought by private land owners contesting the government's assertion of an

29

easement over their lands located in an odd-numbered section and its laying out a road over the asserted easement for the use of persons wishing to reach a federal hunting and fishing area in an even-numbered section of public lands.

The Court reversed the Tenth Circuit's decision that Congress had created an implied easement "to pass over the odd-numbered sections in order to reach the even-numbered sections that were held by the Government." Id. at 678. It held that Congress had not made the desired easement a condition of the land grant and the United States had made no effort to reserve an easement when selling the property to private individuals. In these circumstances, the Court said, it was unwilling to upset title to hundreds of tracts of land. Id. at 687-88. Those circumstances are entirely different from those in this case, starting with the fact that in this case, the land at issue is part of a right-of-way that was recorded within sufficient time to give private landowners notice of competing claims to the land constituting the right-of-way. In Leo Sheep, the government wanted to create a road where one had never been; in this case, the right-of-way had been a part of the land for nearly 100 years, giving full notice to the landowners of a competing claim to that strip of land. The two cases do not raise the same equitable considerations.

2. Even-numbered sections

30

As for the nature of the railroad's title to the right-of-way in section 32, plaintiffs contend that title to land in this even-numbered section comes through Amos Jefferson, who had fee simple title to the land by virtue of his entry certificate and subsequent patent. Defendant does not dispute this contention, except as it relates to the right-of-way. Jefferson could pass his fee simple title to a purchaser of lands; he could not pass any title to the right-of-way, because he never had any. Title to the right-of-way was in the railroad, subject to the United States' reversionary interest. The Supreme Court explained this concept in Bybee, 139 U.S. at 679-80:

> The distinction between a right of way over the public lands, and lands granted in aid of the construction of the road, is important in this connection. As to the latter, the rights of settlers or others who acquire the lands by purchase or occupation between the passage of the act and the actual location and identification of the lands, are preserved unimpaired, while the grant of the right of way is subject to no such condition; . . . a person subsequently acquiring any part of such right of way takes it subject to the prior right of the railroad company. . . "If the company could be compelled to purchase its way over any sections that might be occupied in advance of its location, very serious obstacles would be imposed to the progress of the road. For any loss of lands by settlement or reservation other lands are given; but for the loss of the right of way by these means no compensation is provided, nor could any be given by the substitution of another route."

(quoting St. Joseph & Denver City Railroad Co. v. Baldwin, 103 U.S. 426, 440 (1880)).

In deciding the issue in Mauler, I found it important that Congress stated that the land grants provided that the railroads themselves "shall be and remain public highways."

31

Mauler, 204 F. Supp. 2d at 1176.  In this case, plaintiffs take issue with the significance I attached to the that language.  Citing Lake Superior & Mississippi R.R. Co. v. United States, 93 U.S. 442, 444-445 (1876), they argue that the Supreme Court has made it clear that this condition has nothing to do with reversionary interests.  Their citation is inapposite; the Lake Superior case has nothing to do with interests in real property.  Instead, the Court's focus was on taxation and the meaning of the phrase "shall be and remain public highways 'for the use of the government of the United States, free from all toll or other charge for the transportation of any property or troops of the United States.'"  The question was whether this provision required the railroads to provide transportation over those public highways (the rail lines) free of charge to the United States.  The Court concluded that the language meant that the lines were for public use by virtue of the "grants, corporate subscriptions and municipal gifts which would be valid on no other ground" on the understanding that they are for public use, although it held that the railroads could charge the public and the government for use of the rolling stock the companies provided to ride on the rails.

         In summary, common sense and a fair reading of the historical record support the conclusion that the Chicago & North Western Transportation Company's title to the right-of-way traversing plaintiffs' properties had its source in the Right of Way Act of 1852. However, the point is unimportant.  If one believes, as plaintiffs do, that the Right of Way Act of 1852 played no part in the development of the Bayfield Branch (or any other rail line

32

in Wisconsin), the result is the same because the Land Grant Acts contained *implicit* grants of rights-of-way through both odd and even-numbered sections. Thus, if the Chicago and North Western Railroad did not take its interest in the right-of-way under the Right of Way Act of 1852 through its predecessor, the La Crosse and Milwaukee Railroad, it had an implicit grant of a right-of-way in the 1856 and 1864 Land Grant Acts.

In my view, looking to the Right of Way Act is the obvious and logical way to understand the relationship of the right-of-way to land granted in aid of construction under the Land Grant Acts. Even if it is not, I cannot accept the idea that Congress's grant of lands in aid of construction conveyed a discontinuous strip of land for the railroad's use as a right-of-way. A conclusion so contrary to common sense cannot be correct.

Plaintiffs have cited no statute or case in which Congress or the courts have distinguished between railroad rights-of-way that traverse even-numbered sections or those that traverse odd-numbered sections. In either case, the assumption has been that the railroads have a valid right-of-way. It is also worth noting that neither in this case nor in Mauler, 204 F. Supp. 2d 1168, has anyone argued that the United States has a reversionary interest in any property other than the railroad's original right-of-way.

I conclude that the railroad obtained a limited fee interest in the right-of-way of the Bayfield Branch that traversed both the even and odd-numbered sections and that the

United States retains a reversionary interest in the right-of-way obtained by the railroads in the 1850s and 60s, unless that right has been legally extinguished.

### C. Abandonment of the Reversionary Interest under 43 U.S.C. § 912 and 16 U.S.C. 1248(c)

Plaintiffs argue that because the railroad obtained title to the right-of-way in section 32 through state court proceedings, it is state law that determines whether the right-of-way was abandoned so as to be eligible for sale to private parties.   Because I have concluded that the railroad's title to the right-of-way did not come by way of a private sale but through congressional grant (whether through the Right of Way Act of 1852 or by implication under the Land Grant Acts of 1856 and 1864), I will look to federal law in deciding whether the United States has lost its reversionary interest in the right-of-way under § 912 and 16 U.S.C. § 1248(c).

Section 912 was enacted in 1922 to provide a method for converting "abandoned" rights of way into public highways or disposing of the United States' interest in railroad rights-of-ways to adjacent landowners.  "The legislative history of § 912 reveals that Congress enacted the law primarily to resolve title disputes with respect to abandoned and forfeited federal railroad lands of the type discussed in Townsend."  Mauler, 309 F.3d at 1001.  Under

34

§ 912, a right-of-way is not considered abandoned unless it "is declared or decreed by a court of competent jurisdiction or by Act of Congress." 43 U.S.C. § 912. If abandonment has been declared or decreed, the title to the right-of-way could vest in the adjacent landowners unless a public highway is legally established within one year of a declaration or decree of abandonment.

The enactment of 16 U.S.C. § 1248(c) in 1988 modified § 912 by altering the federally reversionary interest in abandoned rights-of-ways. The modification was an amendment; it did not repeal § 912. Mauler, 204 F. Supp. 2d at 1175. Under § 1248, the United States retained title to such property unless a public highway was established within a year of abandonment. Id.; see also Avista Corporation Inc. v. Wolfe, 549 F.3d 1239, 1250 (9th Cir. 2008). If a former right-of-way was not declared abandoned before 1988, it is no longer possible for adjacent landowners to claim a right to the property.

Wisconsin state law provides that "rail property shall be deemed abandoned if . . . (a) A certificate or approval of abandonment has been issued by the interstate commerce commission . . ." Wis. Stat. § 195.199(3). Plaintiffs point out that on March 1, 1978, well before any of them acquired title to the property along the Bayfield Branch, the Interstate Commerce Commission issued an order permitting the abandonment of the rail line that ran over sections 21 and 32. Fex Decl., dkt. #20, exh. #12.

35

Plaintiffs contend that abandonment was declared both by a court of competent jurisdiction and by an Act of Congress, thereby vesting title to the right-of-way in the adjacent landowners.  In the alternative, plaintiffs argue that if abandonment has not been decreed or declared, this court should declare retroactively that the railroad abandoned the right-of-way in 1978 when it filed its notice of abandonment with the Interstate Commerce Commission.

It is plaintiffs' position that the Wisconsin Court of Appeals declared the right-of-way "abandoned" in State v. Holmgren, 111 Wis. 2d 700, 332 N.W.2d 311 (Ct. App. 1983) (unpublished disposition).  Holmgren dealt with part of the rail line along the Bayfield Branch acquired by a private landowner from the Chicago and North Western Railroad Co. after the company had "abandoned" its rail lines.  Id.  Although Holmgren did not involve the property at issue, plaintiffs argue that abandonment "can be addressed as to the entire line."  In support of this position, plaintiffs cite an unreported decision from the District of Idaho, Hash v. United States, 2000 WL 1460801 (D. Idaho July 7, 2000), and a decision by the Court of Federal Claims, Moore v. United States, 41 Fed. Cl. 394 (1998).

As an initial matter, neither Hash nor Moore is binding on this court.  More to the point, neither case stands for the proposition plaintiffs advance.  Both cases involved the propriety of class actions to determine whether the National Trails System Act, 16 U.S.C. §

1241, constituted a compensable taking under the Fifth Amendment.  <u>Moore</u>, 41 Fed. Cl. at 396-97; <u>Hash</u>, 2000 WL 1460801, at *1.  In neither case did the court hold that abandonment under § 912 could be determined as to an entire line.  Instead, in <u>Moore</u>, the court stated that "[a]lthough the precise nature of these property interests will be explored later, the court notes that it will examine the four corners of the conveyance, a straightforward task, and apply Missouri law, to decide the matter."  <u>Moore</u>, 41 Fed. Cl. at 399.  In other words, to determine the property rights of each landowner, the court would have to address each individual property grant.  The same is true in plaintiffs' situation as well.  For this reason, I conclude that the <u>Holmgreen</u> decision did not constitute a judicial determination of abandonment of the particular right-of-way at issue in this case.

Plaintiffs contend that the Interstate Commerce Commission's order authorizing abandonment in 1978 constitutes an Act of Congress.  Their reasoning is that Congress vested plenary power in the commission to determine whether rail lines had been abandoned.  <u>Chicago and Northwestern Transp. Co. v. Kalo Brick & Tile Co.</u>, 450 U.S. 311, 320-21 (1981); <u>Colorado v. United States</u>, 217 U.S. 153 (1926).  Although plaintiffs are correct that the ICC is authorized to determine whether abandonment is proper, the Supreme Court has never held that the commission's determination constitutes an Act of Congress.

A court must enforce the clear language of a statute where it is unambiguous and the

statutory scheme is coherent and consistent.  <u>Perry v. First National Bank</u>, 459 F.3d 816 (7th Cir. 2006).  Section 912 states that a declaration or decree of abandonment requires an Act of Congress.  It does not say that a determination by the ICC will suffice.

It is congruent with the statutory scheme that Congress must make the official declaration of abandonment, when it was Congress that granted the property rights through its land grants.   As the Court of Appeals for the Ninth Circuit held in discussing abandonment under § 912:

> While petitioning the I.C.C. for abandonment proceedings is indicative of a railroad's intent to abandon, '[t]he I.C.C. does not determine abandonment.' Rather, action by the I.C.C. "is only a determination that under its Congressional mandate, cessation of service would not hinder the I.C.C.'s purposes.

<u>Avista Corp. Inc.</u> 549 F.3d at 1249 (internal citation omitted).

Anticipating the possibility that the court would determine that no formal abandonment occurred under § 912, plaintiffs argue that retroactive abandonment would be proper because, as a practical matter, the property has been abandoned since 1978 and no public highway has been established.  Plaintiffs' argument finds no grounding in the language of § 912, which makes no mention of retroactive declaration of abandonment.  Such a declaration would be inconsistent with the statutory scheme.  Section 912 provides that upon a formal declaration of abandonment, the title to the right-of-way will vest in adjacent

38

landowners if the right-of-way is not used for a public highway within one year of abandonment. To allow courts to enter retroactive declarations of abandonment would extinguish the rights of states, counties and municipalities to take property for public purposes as Congress intended. As the Court of Appeals for the Ninth Circuit concluded in Avista Corp. Inc., 549 F.3d 1239, a court cannot declare a retroactive declaration of abandonment.

> A declaration of retroactive abandonment would be inconsistent with the plain language of § 912, which requires both physical abandonment and a formal declaration of abandonment for reversionary interests to vest. A retroactive declaration would also be incompatible with the structure of § 912, because it would deprive local and state governments of the opportunity to acquire the right-of-way pursuant to the § 912 highway exception. For example, here, the operation of the district court's decision deprived Sanders County of the opportunity to acquire the right-of-way by first applying a declaration of abandonment retroactively, then declaring the County's rights under the highway exception extinguished by failure to act. We construe statutes to avoid such arbitrary forfeitures of property rights.

Id. at 1250 (footnotes omitted). Because § 912 contains no express authorization of retroactive abandonment and such an authorization would effectively extinguish a property right Congress bestowed on government entities, I conclude that the statute does not allow a court to declare retroactive abandonment. Thus, in this case, if the right-of-way is declared to have been abandoned by the Chicago and North Western, it would revert to the United States under the express terms of 16 U.S.C. § 1248 (c) (right-of-way not declared abandoned

39

before 1988 or abandoned and not used for public highway within one year of abandonment reverts to United States).

### D. Equitable Estoppel

Plaintiffs argue that even if this court finds that the right-of-way was subject to reverter to the United States and was not declared abandoned under § 912, the doctrine of equitable estoppel should bar defendant from laying claim to an interest in the disputed right-of-way. Although equitable estoppel is an extreme remedy, plaintiffs maintain that it is proper in this case because they relied on the actions and inactions of various government entities to their detriment. They point out that they have expended their personal finances in improving the property in question, including the disputed right-of-way.

As a general rule, equitable estoppel operates against the government only in rare circumstances. Gibson v. West, 201 F.3d 990, 994 (7th Cir. 2000) ("Equitable estoppel against the government is disfavored and is rarely successful"); United States v. Fox Lake State Bank, 366 F.2d 962, 965 (7th Cir. 1966) (acknowledging that doctrine applies in proper circumstances, but "must be applied with great caution to the government"). To establish equitable estoppel, the party seeking to assert it must show (1) a misrepresentation by the opposing party; (2) reasonable reliance on that misrepresentation; and (3) detriment.

40

Lewis v. Washington, 300 F.3d 829, 834 (7th Cir. 2002) (citing LaBonte v. United States, 233 F.3d 1049, 1053 (7th Cir. 2000)).  In addition, when raising a claim of equitable estoppel against the government, a party must prove affirmative misconduct, such as an act to misrepresent or mislead.  Id.  A government's failure to discharge an 'affirmative obligation' is not the same as engaging in 'affirmative misconduct.'"  Gibson, 201 F.3d at 994 (citing Edgewater Hospital, Inc. v. Bowen, 857 F.2d 1123, 1138 n.8 (7th Cir. 1988)).  "Moreover, omissions amount only to ordinary negligence."  Lewis, 300 F.3d at 834.

Plaintiffs do not argue that any of the government entities involved in this dispute misrepresented facts or misled them with respect to proper title to the right-of-way.  Instead, they contend that the government may be estopped in the absence of "affirmative misconduct" when it has an obligation to act but fails to do so, United States v. Georgia-Pacific Co., 421 F.2d 92, 97 (9th Cir. 1970) ("'It is axiomatic that equity will not grant relief to one who has stood by and permitted the expenditure of large sums of money upon the faith and belief that he does not deem his rights to be violated."), or when asserting a reversionary interest in a railroad right-of-way,  United States v. Denver & R.G.W.R. Co., 16 F.2d 374 (8th Cir. 1926).  In Georgia-Pacific, the United States failed to comply with a contract with a private party regarding acquisition of private lands.  The court of appeals found that the application of equitable estoppel was proper because "the Government [was] suing to enforce a contract between it and a third party, and thus acting as a private party

41

would." <u>Georgia-Pacific Co.</u>, 421 F.2d at 101.  In analyzing the applicability of the doctrine, the court of appeals noted that such a claim could not be raised against the government when it was acting in its sovereign role, such as "carrying out its unique governmental functions for the benefit of the whole public."  <u>Id</u>.  The court added that the doctrine of equitable estoppel would not be available if the United States was asserting its right to public land.  <u>Id</u>. ("The question here is not that of preserving public lands—since the Government never had title to the cutover lands it is now claiming—but only of enforcing a private contract to gain new title to lands."); <u>see also</u> <u>United States v. State of California</u>,  332 U.S. 19, 40 (1947) ("the Government, which holds its interests here as elsewhere in trust for all the people, is not to be deprived of those interests by the ordinary court rules designed particularly for private disputes over individually owned pieces of property").

With respect to equitable estoppel claims involving "public lands," plaintiffs are correct that in <u>Denver & Rio Grande Western Railroad Co.</u>, 16 F.3d 374, the court barred the United States from asserting its rights to a reversionary interest on the ground of equitable estoppel.  However, that case is readily distinguishable.  The defendant railroad company had received a grant of a right-of-way on a condition that the railroad be built within five years of the grant.  Although the railroad completed the construction of the tracks within five years, the tracks were later washed away in a flood.  <u>Id.</u>  Ten years later, when the railroad company began restoring the railroad, the Secretary of the Interior approved an

42

application for a second portion of the right-of-way.  The court found that the United States had waived its possible right to insist on the railroad's forfeiture of the right-of-way grant for the first portion of the track by waiting while the railroad company made significant expenditures; as to the second portion, however, forfeiture was proper in light of the lack of effort on the railroad to construct a track on this part of the right-of-way.

In this case, plaintiffs may have made certain expenditures on the right-of-way (the extent of which are unknown), but the United States and defendant have not forfeited any rights by their inaction.  This case is not like Denver & Rio Grande Western Railroad. Plaintiffs were not putting money into the construction or reconstruction of the railroad bed that was the purpose of the government's grant.  It is true that Samuel and Imogene Johnson paid the Forest Service $100,000 at the Forest Service's urging, but they were motivated to do so by their own desire to prevent the public's use of the right-of-way.  They knew that the transaction was risky:  the Forest Service explained that it was asking for private funds because, among other things, it did not have time to conduct a title search.

The Forest Service may have represented that the right-of-way was not the property of the United States and the Attorney General may have tried to disclaim the property in the earlier proceedings before Judge Shabaz, but neither of these actions constitutes a forfeiture or release of the government's rights.  United States v. State of California, 332 U.S. 19, 40

43

(1947) ("officers who have no authority at all to dispose of Government property cannot by their conduct cause the Government to lose its valuable rights by their acquiescence, laches, or failure to act"); Royal Indemnity Co. v. United States, 313 U.S. 289, 294 (1941) ("Subordinate officers of the United States are without [the] power [to release or otherwise dispose of the rights and property of the United States], save only as it has been conferred upon them by Act of Congress or is to be implied from other powers so granted").  Therefore, even under the reasoning in Denver & Rio Grande Western Railroad Co., 16 F.3d 374, the doctrine of equitable estoppel would be inapplicable in this case because the United States' inaction did not result in a forfeiture of its claim to the right-of-way.

In sum, because plaintiffs have failed to show that the United States, Bayfield County or other government entities engaged in affirmative misconduct or that any government entity forfeited any rights it had in the right-of-way, equitable estoppel is inappropriate.

ORDER

IT IS ORDERED that the motion for summary judgment, dkt. #16, filed by plaintiffs Samuel C. Johnson 1988 Trust, Imogene Johnson, John and Kay Hawksford and Dean and Kathryn Johnson is DENIED in all respects.  The clerk of court is directed to enter judgment

for defendant Bayfield County and close this case,

Entered this 26th day of June, 2009.

BY THE COURT:

/s/

_____

BARBARA B. CRABB

District Judge